Filed 6/13/24  P. v. Greer CA4/2
Opinion following transfer from Supreme Court
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076749 |
| v. | (Super. Ct. No. FVI1300018) |
| RONALD DEAN GREER et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Daniel W. Detienne, Judge.  Affirmed.

818 Law Group and Brett A. Greenfield, for Defendant and Appellant, Ronald D. Greer.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant, Bianca A. Stanch.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.

## INTRODUCTION

Defendant and appellant Ronald Greer's four-year-old daughter, Samiah Downing, died of dehydration while locked in a room at home. A jury convicted him and his girlfriend, defendant and appellant Bianca Stanch, of first degree murder, torture, and child abuse. The trial court sentenced both of them to a term of 25 years for the murder conviction, a consecutive term of seven years to life for the torture conviction, and a six-year concurrent term for the child abuse conviction.

Stanch and Greer argued (1) the trial court failed to instruct the jury that it had to find defendants acted with malice aforethought to convict them of first degree murder, (2) the court erroneously found that separate sentences were appropriate for each conviction, and (3) the matter must be remanded for resentencing under recently enacted legislation. Greer also argued the trial court erroneously denied his motion for a new trial. We rejected defendants' contentions and affirmed the judgment.

Our Supreme Court granted review and remanded with directions to vacate our decision and reconsider the cause in light of *People v. Salazar* (2023) 15 Cal.5th 416 and *People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*). We have done so after receiving supplemental briefs from the parties. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Greer's ex-girlfriend gave birth to Samiah in 2008. She started living with him and Stanch full-time in June 2012. Stanch did not like Samiah and often disciplined her harshly.

In July 2012, Greer and Stanch asked their friend, S.R., to babysit Samiah. Just after they left her in S.R.'s care, Samiah quickly drank a bottle of water. She told S.R. that she was not allowed to drink water at home. Although Greer and Stanch did not ask S.R. to watch Samiah overnight nor bring her a change of clothes, S.R. ended up watching Samiah for three to five days.

About a month later, Stanch and Samiah went over to S.R.'s house to have their hair done. Stanch told Samiah to sit quietly in one spot, but did not instruct her own child to do the same. Samiah looked at S.R. for permission to do anything.

During another visit, S.R. made sandwiches for her children and asked whether Samiah wanted one. Stanch told Samiah that if she had a sandwich, she could not have a burger later, but Stanch gave her child a sandwich unconditionally. S.R. noticed that Samiah had what looked like a welt on her eye. Stanch said that she had spanked Samiah with a belt and accidentally hit her eye.

Around the same time, Samiah's teachers noticed that she ate much more food during breakfast than her peers and drank an unusual amount of water. Stanch had to pick up Samiah at school once because she wet her pants. Her teacher noticed Stanch

was rough with her, yelled at her, and gave her angry looks. Stanch told Samiah's teacher not to give her water.

On another occasion, Samiah's teacher noticed what looked like a belt buckle mark above her eye. The teacher's aides thought it was a black eye. Samiah told her teacher that Stanch "whooped her" the night before. But when Greer dropped her off that morning, he said she fell off the bed and hit her head on a dresser.

Samiah's teacher made a referral to Child Protective Services. A social worker spoke with Greer, Stanch, and Samiah, who reported that Stanch hit her with a belt and sometimes locked her in her room.

Stanch's cousin, Rayshawn, lived with her and Greer toward the end of 2012. He saw Stanch whip Samiah with a belt multiple times every day. Although Greer was present, he never tried to stop Stanch. Both Greer and Stanch often withheld food and water from Samiah, sometimes for multiple days. They both told Rayshawn not to give Samiah anything. Rayshawn also saw Stanch force Samiah to stand in a corner for hours as punishment.

Stanch's cousin, Sharelle, learned that Greer taped Samiah's wrists and ankles to stop her from drinking water. Sharelle also learned that Samiah drank cleaning supplies because she was so thirsty.

Rayshawn's girlfriend, Destinee, lived with Greer and Stanch in the summer of 2012. She also saw Stanch taping Samiah's hands and ankles together before putting her to bed. Greer did not stop Stanch or help Samiah. Destinee also saw Stanch regularly

4

beat Samiah with a belt and saw Greer and Stanch confine Samiah in her bedroom by duct taping the door shut. Although Greer hit Samiah, he did not hit her as often or as hard as Stanch did.

In December 2012, Stanch repeatedly whipped Samiah with a cord. Stanch then poured a pot of boiling water on Samiah's back. Rayshawn told Stanch to stop, but Greer did nothing to stop her. Stanch then took Samiah to her bedroom and began whipping her with the cord again.

Later that evening, Greer and Stanch went out to dinner while Rayshawn watched Samiah. As he was leaving, Greer told Samiah, who had not had water for two or three days, that she would get water when they got back if she was good. Greer then locked Samiah in her bedroom and left.

When they returned several hours later, Samiah was dead. Greer decided to bury Samiah in the desert. He and Rayshawn wrapped her body in a sleeping bag, carried her to the car, and then drove to the desert with Stanch. Greer and Rayshawn dug a small grave and buried Samiah. Greer and Stanch told Rayshawn to tell people that Samiah was visiting relatives and offered to pay him hush money.

Rayshawn, however, told his sister what happened, and her husband contacted the police. Law enforcement exhumed Samiah's body and observed she had multiple facial injuries. Rayshawn later told law enforcement what had happened.

An autopsy revealed that Samiah had suffered extensive injuries across her entire body, indicating she had been whipped. There were fresh scald wounds on her back. She

was malnourished and significantly underweight.  The coroner concluded that she died of dehydration.

A jury convicted Greer and Stanch of first degree murder (Pen. Code, § 187, subd. (a)),[1] torture (§ 206), and child abuse (§ 273a, subd. (a)), with an enhancement for willful harm resulting in death (§ 12022.95).  The jury found true the enhancement allegation that they had inflicted great bodily injury on Samiah (§ 12022.95).  The jury, however, found a torture special circumstance allegation against Stanch not true (§ 190.2, subd. (a)(18)).

The trial court sentenced Greer and Stanch to 32 years to life in state prison.  The trial court sentence consisted of 25 years to life for the murder with a consecutive seven years to life for the torture, plus a concurrent term of six years for the child abuse conviction.  The court stayed the sentence for the enhancement.

## III.

## DISCUSSION[2]

A. *Greer's New Trial Motion*

After the jury convicted Greer, he moved for a new trial on the first degree murder

---

[1]  All further statutory references are to the Penal Code.

[2]  Greer did not file a supplemental brief after we vacated our prior decision pursuant to the Supreme Court's transfer order.  In her supplemental brief on remand, Stanch argues the order affects only our decision as it relates to the jury instruction issue (section III.B) and her argument that the matter should be remanded for resentencing under amended section 654 (section III.D.)  We therefore do not alter our prior decision on the remaining issues (sections III.A. and III.C).

6

conviction under section 1181(6). He argued insufficient evidence supported the jury's finding that he acted willfully, deliberately, or with premeditation. Therefore, the jury could have convicted him of only second degree murder. The trial court denied the motion, finding that there was sufficient evidence for the jury to convict Greer of first degree murder.

When a defendant moves for a new trial under section 1181(6), the trial court sits as a "13th juror" and examines the evidence to determine whether it is sufficient to prove the defendant's guilt beyond a reasonable doubt. (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) The court has "broad discretion" in determining whether the evidence is sufficient, and its decision will not be reversed "'absent a manifest and unmistakable abuse of that discretion.'" (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1252.) When reviewing the trial court's decision, we consider "the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence— that is, evidence which is reasonable, credible, and of solid value—from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069.)

Defendant was prosecuted under two theories of first degree murder: (1) Samiah's murder was willful, deliberate, and premeditated, and (2) the murder was committed by torture. The pertinent difference between the theories is that murder-torture does not require proof that the defendant intended to kill the victim, while the first theory does. Instead, murder-torture requires only proof that the defendant intended "to inflict extreme

7

and prolonged pain on the person killed while that person was still alive." (CALCRIM No. 521.)

As a result, the trial court only had to find there was sufficient evidence of premeditation and deliberation to uphold the jury's first degree murder verdict. In any event, defendant challenges only the trial court's finding that there was sufficient evidence of premeditation. We conclude there was substantial evidence that Greer acted with deliberation and premeditation and so the trial court properly denied his motion for a new trial.

""""Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time."""" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)

In *People v. Anderson* (1968) 70 Cal.2d 15, the California Supreme Court "identified three categories of evidence relevant to determining premeditation and deliberation: (1) events before the murder that indicate planning; (2) a motive to kill; and (3) a manner of killing that reflects a preconceived design to kill." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.) These factors are "'descriptive, not normative' . . . are not all required . . . nor are they exclusive in describing the evidence that will support a finding of premeditation and deliberation." (*Ibid*.) We therefore "need not accord them any particular weight." (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 420.)

Substantial evidence supports the jury's finding that Greer acted with premeditation and deliberation. Greer not only let Stanch physically abuse Samiah repeatedly for months, he often participated in the abuse himself. Although he did not hit Samiah as often or as hard as Stanch did, he still hit her many times. On more than one occasion, Greer taped Samiah's hands and ankles together so she could not drink water. He often withheld water from Samiah for so long that she would drink cleaning supplies and her teacher noticed she drank an unusual amount of water at school. Greer also withheld food from Samiah for days at a time, which caused her to eat an unusual amount at school. At the time of her death, she was malnourished and unusually thin.

Greer's conduct in the hours before Samiah's death also suggests that he acted deliberately and with premeditation. After letting Stanch hit Samiah repeatedly with a cord, Greer did nothing when Stanch then poured boiling water on Samiah. He did not intervene when Stanch then took Samiah into her room and resumed whipping her with the cord. At that point, Samiah had not had water for two or three days, yet Greer locked her in her room and went out to dinner, causing her to die of dehydration within a few hours. When Greer returned, he did not summon medical help for Samiah, but buried her body in the desert while offering Rayshawn money to keep quiet about the murder.

From this evidence, which we must view in the light most favorable to the judgment, the jury could reasonably find that Greer acted deliberately and with premeditation. (See *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201-202 [evidence of "continuing and escalating acts of abuse" in two-month period supported finding of

9

premeditation and deliberation]; *People v. Mincey* (1992) 2 Cal.4th 408 [victim's extensive wounds and injuries showed deliberation and premeditation]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082 [defendant's conduct to prevent summoning medical care showed killing was deliberate and with premeditation].) Because substantial evidence supports the jury's finding that Greer was guilty of first degree murder, the trial court properly denied his motion for a new trial.

Greer argues otherwise, relying on various cases in which parents were found guilty of second degree murder for the death of their young children. (See *People v. Jones* (2018) 26 Cal.App.5th 420; *People v. Latham* (2012) 203 Cal.App.4th 319; *People v. Rolon* (2008) 160 Cal.App.4th 1206; *People v. Burden* (1977) 72 Cal.App.3d 603.) But in each case, the defendant was charged and convicted of second degree murder and argued the evidence was insufficient to support the conviction. (*People v. Jones*, *supra*, at p. 442; *People v. Latham*, *supra*, at p. 321; *People v. Rolon*, *supra*, at p. 1211; *People v. Burden*, *supra*, at pp. 606-607.) None of the cases Greer relies on addressed whether the evidence was sufficient to support a defendant's conviction for first degree murder, so they do not apply here. (*People v. Hatt* (2018) 20 Cal.App.5th 321, 326 ["A case is not authority for a proposition not considered."].)

B. *Jury Instructions*

Greer and Stanch contend their murder convictions must be reversed because the jury instructions impermissibly "allowed the jury to impute malice" to them as an aider

and abettor based on their participation in the underlying crimes in violation of their rights under federal and California law.[3] We disagree.

Murder is the unlawful killing of a human with malice aforethought. (§ 187, subd. (a).) Malice is express "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).)

First degree murder occurs when the murder is willful, premeditated, and deliberate. (§ 189, subd. (a).) First degree torture-murder is a form of willful, premeditated, and deliberate murder. (§ 189, subd. (a).) "To prove torture murder, the prosecution must establish "'a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose."'" (*People v. Streeter* (2012) 54 Cal.4th 205, 237.)

California law previously provided that a defendant who acted without malice aforethought still could be liable for murder under the felony-murder rule. (*People v. Eynon* (2021) 68 Cal.App.5th 967, 972.) Senate Bill No. 1437 changed the law "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who

---

[3] Stanch initially withdrew this argument in her reply brief. Later, however, Stanch moved for and was granted the opportunity to reassert the argument in a supplemental brief. We then construed Greer's joinder notice as joining Stanch's argument in her first supplemental brief.

11

acted with reckless indifference to human life." (Senate Bill No. 1437; Stats. 2018, ch. 1015, § 1, subd. (f).)

Section 188 now provides that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§188, subd. (a)(3).) Instead, a defendant must act with malice aforethought "in order to be convicted of murder." (§188, subd. (a)(3).) Senate Bill No. 1437 also amended section 189 to restrict felony-murder liability to require that the perpetrator of an enumerated felony be the actual killer, aid and abet the actual killer with the specific intent to kill, or be "a major participant in the underlying felony [who] acted with reckless indifference to human life." (§ 189, subd. (e).)

CALCRIM No. 521, as given to the jury, explained the elements of torture-murder as follows: "The defendant murdered by torture if: 1. He or she willfully, deliberately, and with premeditation intended to inflict extreme and prolonged pain on the person killed while that person was still alive; 2. He or she intended to inflict such pain on the person killed for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; 3. The acts causing death involved a high degree of probability of death; AND 4. The torture was a cause of death." In defendants' view, this instruction allowed the jury to convict them of murder without a finding of malice.

CALCRIM No. 520, entitled "First or Second Degree Murder With Malice Aforethought," told the jury that the elements of murder are "1A. The defendant committed an act that caused the death of another person; OR 1B. The defendant Ronald

12

Greer had a legal duty as a parent to care for Samiah Downing and the defendant failed to perform that duty and that failure caused the death of another person; AND 2. When the defendant acted or failed to act, *he or she had a state of mind called malice aforethought*." (Italics added.)

The instruction then explained express and implied malice. The instruction defined express malice as "he or she unlawfully intended to kill." As for implied malice, the instruction stated: "The defendant had implied malice if: [¶] 1. He or she intentionally: committed the act or failed to act; [¶] 2. The natural and probable consequences of the act or failure to act were dangerous to human life; [¶] 3. At the time he or she acted or failed to act, he or she knew his or her act or failure to act was dangerous to human life; [¶] AND 4. He or she deliberately: acted or failed to act with conscious disregard for human life."

CALCRIM No. 521 explained that defendants could be guilty of first degree murder under a murder-by-torture theory. The instruction stated: "The defendant is guilty of first degree murder if the People have proved that the defendant murdered by torture. The defendant murdered by torture if: [¶] 1. He or she willfully deliberately, and with premeditation intended to inflict extreme and prolonged pain on the person killed while that person was still alive; [¶] 2. He or she intended to inflict such pain on the person killed for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; [¶] 3. The acts causing death involved a high degree of probability of death; [¶] AND [¶] 4. The torture was a cause of death."

13

The jury also received instructions on aider-and-abettor liability. CALCRIM No. 400 said, "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

CALCRIM No. 401 instructed the jury: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

14

Defendants argue that the instructions, in particular the aider-and-abettor instructions, allowed the jury to erroneously impute malice based on their participation in the underlying crimes. In support, they rely on *People v. Maldonado* (2022) 301 Cal.Rptr.3d 919. After defendants filed their supplemental opening brief, however, the *Maldonado* court granted the People's petition for rehearing and vacated the opinion. (*Id*. at p. 919.) We therefore cannot consider it. (Cal. Rules of Court, rule 8.1105(e)(1)(A).)

But, on rehearing, the *Maldonado* court held the jury instructions impermissibly allowed the jury to convict the defendant of first degree murder on a theory of imputed malice made invalid by Senate Bill No. 1437. (*People v. Maldonado* (2023) 87 Cal.App.5th 1257, 1264.) The jury in that case was instructed on the elements of aiding and abetting a lying-in-wait murder, which included CALCRIM No. 401. (*Ibid*.) The *Maldonado* court held that CALCRIM No. 401 was ambiguous and could be read as instructing the jury that the defendant was guilty of first degree lying-in-wait murder as an aider-and-abettor even if he only intended "to injure or intimidate the victim in a surprise attack" and encouraged the direct perpetrator's attack. (*Ibid*.) Under the law of murder as amended by Senate Bill No. 1437, however, the defendant could be found guilty of first degree murder only if he acted with malice, meaning that he knew the attack was dangerous to human life and he acted with conscious disregard for human life. (*Id*. at p. 1264.) As a result, *Maldonado* held that the ambiguity created by CALCRIM

15

No. 401 left open the possibility that the jury convicted the defendant of murder under a now-invalid theory of imputed malice. (*Ibid*.)

In our prior opinion, we found *Maldonado* persuasive and followed it. We therefore agreed with defendants that CALCRIM No. 401 wrongly suggested that the jury could find them guilty of first degree murder as an aider-and-abettor irrespective of their mental state. (See *People v. Langi* (2022) 73 Cal.App.5th 972, 981; *People v. Powell* (2021) 63 Cal.App.5th 689, 714.) This is because the instructions told the jury that either defendant was guilty of first degree murder "if it found that (1) the killing resulted from the actual killer's intentional act; (2) [Greer or Stanch] aided and abetted that intentional act; and (3) the killer "deliberately performed [the act] with knowledge of the danger to, and with conscious disregard for, human life'—whether or not [*Greer or Stanch*] knew of or consciously disregarded the danger to human life." (*People v. Langi*, *supra*, at p. 981.) As in *Maldonado*, this instruction thus created an ambiguity under which the jury *could have* found either defendant guilty of first degree murder as an aider-and-abettor under an imputed malice theory "without finding that [he or she] personally acted with malice," but instead only intended to aid the direct perpetrator (the other defendant) in committing an intentional *act*. (*Id*. at p. 982.) For instance, the jury could have found one defendant directly withheld water from Samiah, causing her death, while the other defendant only intended to help the direct perpetrator withhold the water.

The People do not challenge *Maldonado*'s analysis as far as it goes, but contend there is a "next step" in the analysis, which asks whether there is a reasonable likelihood

16

that the jury understood the instructions as conveying an invalid theory (imputed malice murder). In *Maldonado*'s now-vacated opinion, the court did not address this issue, which the People raised for the first time in a petition for rehearing. (*People v. Maldonado*, *supra*, 87 Cal.App.5th at p. 1268.) On rehearing, the court assumed without deciding that "the reasonable likelihood standard" applied in the *Maldonado* defendant's appeal from a summary denial of his section 1172.6 petition while noting that the standard "originated in the direct appeal context." (*Id*. at p. 1268, fn. 8.)

In our prior opinion, we agreed with the People that the reasonable likelihood standard applied here. (See *Boyde v. California* (1990) 494 U.S. 370, 380 [rejecting "standard which makes the inquiry dependent on how a single hypothetical 'reasonable' juror could or might have interpreted the instruction"]; *Estelle v. McGuire* (1991) 502 U.S. 62, 73, fn. 4 ["[W]e now disapprove the standard of review language in" two intervening cases that used "could have understood" and "would have understood" "and reaffirm the standard set out in *Boyde*"]; *People v. Clair* (1992) 2 Cal.4th 629, 663 [adopting the reasonable likelihood standard for assessing instructions under California law]; *People v. Covarrubias* (2016) 1 Cal.5th 838, 926 (*Covarrubias*) [same, citing *Estelle v. McGuire*, *supra*, at p. 72].)

To satisfy the reasonable likelihood standard, a defendant "must demonstrate a reasonable likelihood that the jury misconstrued or misapplied the instruction in the manner asserted." (*Covarrubias*, *supra*, 1 Cal.5th at p. 926; *People v. Clair*, *supra*, 2 Cal.4th at p. 663.) Put another way, "'[t]he test is whether there is a "reasonable

likelihood that the jury . . . understood the charge" in a manner that violated defendant's rights.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 476.)

"'Although a defendant need not establish that the jury was more likely than not to have been impermissibly' directed by the ambiguous instruction, the standard is not met if there is 'only a possibility' the jury was so directed." (*People v. Maldonado*, *supra*, 87 Cal.App.5th at p. 1268.) We consider the instructions as a whole and the arguments of counsel to determine whether the defendant has met the standard. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

In the People's view, there is no reasonable likelihood that the jury convicted defendants of murder *solely* as aider-and-abettors without finding they acted with "at least implied malice" given the jury instructions and the prosecutor's closing argument.

The People note that the standard murder instruction, CALCRIM No. 520, told the jury that defendants were guilty of murder only if they acted with express or implied malice. But that does not completely dispel the ambiguity created by CALCRIM No. 401, which the trial court told the jury applied to all counts in response to its question. While CALCRIM No. 520 told the jury defendants were guilty of murder only if they acted with malice, CALCRIM No. 400 also suggested they were guilty of murder as an aider-and-abettor if they intended to help the direct perpetrator's intentional act—in this case, withholding water from Samiah—even if they did not have the requisite mental state required for murder.

18

In our prior opinion, we agreed with the People that the prosecutor's argument cleared up CALCRIM No. 401's ambiguity.  (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)  The prosecutor repeatedly emphasized that both defendants were guilty of murder as direct perpetrators because they both withheld water from Samiah, who died from dehydration.  The prosecutor likewise repeatedly argued that defendants' conscious decision not to give Samiah water was evidence that they acted with malice.  As the prosecutor put it, "[t]hey knew that was dangerous to her life.  When they acted, knowing that danger to her life, they consciously disregarded it and did it anyways. . . ."  "There is malice in this killing. . . .  [T]hey caused the death by denying her water and [] they acted with malice.  They knew the danger and denied her water anyways, and because of that, they are guilty of murder."

The prosecutor later explained aider-and-abettor liability, explaining that an "actual perpetrator," such as someone who "pulls the trigger," is as guilty of murder as someone who aids and abets the perpetrator.  The prosecutor then outlined how the principle *could* apply in this case:  "[S]o as you look at the elements of any of these crimes, be it the first degree murder, torture, child abuse, any of these, either defendant can be guilty as the direct perpetrator because they directly, for instance, denied her water to the point she died of dehydration, or you can find that -- in fact, I think one of the defendants was the one directly denying the water.  And I think the other defendant was aiding and abetting that, was facilitating or encouraging that.  Now, what the direct

19

perpetrator was doing and facilitated it by allowing her or him to do it.  Allowing her to be alone with his daughter, for instance.  Allowing her to take over the disciplinary role for instance.  Knowing what she was doing to his daughter and failing to stop it.  [¶]  In fact, facilitating it by allowing her to be alone or to be the disciplinarian of that child."

After explaining aider-and-abettor liability, however, the prosecutor argued that the jury that Greer was a "direct perpetrator" because he "directly deprived" Samiah of water.  The prosecutor noted that although Greer was "a direct perpetrator of these crimes," he could be liable as an aider-and abettor.  The prosecutor explained:  "[I]f you believe as you go through the facts and the three crimes charged here, that *at times* he was not the direct perpetrator, that he wasn't the one actually running the show, he knew about it, he facilitated it by stepping back and telling [Stanch] she would take over, that she could decide when cords and belts were okay, well then, the defendant very well may be guilty as an aider and abettor *and* a direct perpetrator."  (Italics added.)

As for Stanch, the prosecutor *never* argued she was guilty of any of the crimes as just an aider-and-abettor.  Instead, the prosecutor hammered on the fact that Stanch was an actual perpetrator because she withheld water from Samiah.  The prosecutor stated throughout his closing argument that she was guilty of first degree murder because she knowingly withheld water from Samiah to punish and torture her even though she knew that it was dangerous to Samiah's life.  In doing so, the prosecutor emphasized several times that Stanch's conduct and inaction (withholding water) was evidence that she acted with malice.  Given these arguments and the evidence showing that Stanch directly

20

contributed to Samiah's death by withholding water from her, we concluded in our propr opinion that it is highly unlikely the jury convicted her of first degree murder as an aider-and-abettor. (Cf. *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 182-183 [not reasonably likely jury erroneously construed ambiguous instruction on coconspirator and aider-and-abettor special circumstance in part because the prosecutor never argued the jury "need not find intent to kill as to one of the two defendants"].)

The same holds true for Greer. Although the prosecutor noted that Greer could possibly be liable for first degree murder as an aider-and-abettor, the prosecutor consistently argued that he was an actual perpetrator because he withheld water from Samiah, which showed he acted with malice. When discussing aider-and-abettor liability as it applied to Greer, the prosecutor notably did not argue Greer was liable as an aider-and-abettor for Stanch's withholding water. Instead, the prosecutor suggested that the jury could "for instance" find that "at times" he was not the actual perpetrator because he did not stop Stanch's physical abuse. The prosecutor continued, however, that if the jury so concluded, then he should be found guilty as an aider and abettor *and* a direct perpetrator.

In short, the prosecutor did not argue either defendant was guilty as an aider-and-abettor because he or she helped the other defendant withhold water from Samiah, although he acknowledged the jury could permissibly make that finding. (See *People v. Williams* (2013) 56 Cal.4th 630, 688 [not reasonably likely that jury erroneously interpreted ambiguous instruction on accomplice liability in part because the prosecutor

21

"argued that defendant was a direct participant in the crimes or acted with knowledge and purpose in aiding" them].) He instead emphatically argued that defendants were both liable as direct perpetrators because they both acted with malice by withholding water from Samiah, which was the undisputed cause of her death. (See *People v. Bedolla* (2018) 28 Cal.App.5th 535, 548 ["it was not reasonably likely that the jury misunderstood or misapplied the challenged instructions" where "the prosecutor's closing argument . . . reinforced a correct understanding of the instructions"].)

Finally, there is a more fundamental logical problem with defendants' argument. The undisputed cause of Samiah's death was dehydration, which occurred because she did not have water for two to three days while in defendants' care. Aiding and abetting the murder thus necessarily required withholding water from her. One defendant could not knowingly aid and abet the other in withholding water from Samiah without also withholding water from her himself or herself. If, for instance, Stanch knew that Greer withheld water from Samiah for two to three days and intended to help him do so, she necessarily would have had to withhold water from Samiah too. Both defendants therefore necessarily committed the same death-causing act of depriving Samiah of water, which was strong evidence that they both acted with malice.

For the foregoing reasons, we concluded in our prior opinion that there there was no reasonable probability that the jury convicted defendants of first degree murder under an aider-and-abettor theory of liability. (See *People v. Mills* (2012) 55 Cal.4th 663, 679.) As a result, we found that any ambiguity in CALCRIM No. 400 did not violate

defendants' rights under federal or California law.  (*Covarrubias*, *supra*, 1 Cal.5th at p. 668.)

The parties agree that the Supreme Court's order directing us to reconsider the case in light of *Aledamat*, *supra*, 8 Cal.5th at p. 11, applies only to this issue.  We conclude *Aledamat* does not affect our prior decision's finding that there was no prejudicial instructional error.  In doing so, we clarify our holding that "there was no reasonable probability that the jury convicted defendants of first degree murder under an aider-and-abettor theory of liability."

In *Aledamat*, our Supreme Court held that when a jury is instructed on both valid and invalid alternative theories of guilt, the error in instructing on the erroneous theory is reviewed for prejudice under the federal beyond reasonable doubt prejudice standard.  (*Aledamat*, *supra*, 8 Cal.5th at p. 6; *Chapman v. California* (1967) 386 U.S. 18.)  There, the defendant assaulted the victim with a deadly weapon by thrusting a box cutter at the victim from a few feet away while saying, "'I'll kill you.'"  (*Aledamat*, *supra*, at p. 4.)  The box cutter was not an inherently deadly weapon as a matter of law, yet the trial court instructed the jury with CALCRIM No. 875, which defined "'a deadly weapon' as 'any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or ... great bodily injury.'"  (*Aledamat*, *supra*, at p. 4.)  The jury was therefore instructed with an invalid theory of guilt (the box cutter was inherently deadly) and a valid theory of guilt (the defendant used the box cutter in a deadly way).  (*Id*. at p. 3.)  Our Supreme Court granted review to

23

determine whether the error should be reviewed under the federal beyond-a-reasonable-doubt standard or the California reasonable probability standard, and then held that the federal standard applied and found the error harmless. (*Id*. at pp. 5, 13-16.)

*Aledamat* thus had no occasion to consider the issue here. The issue here requires us to decide whether the jury misunderstood and misapplied a potentially ambiguous instruction. In *Aledamat*, however, it was undisputed that the jury instructions were invalid *as a matter of law* because a box cutter is not an inherently deadly weapon. (See *Aledamat*, *supra*, 8 Cal.5th at p. 7 ["[T]he trial court erred in presenting the jury with two theories by which it could find the box cutter a deadly weapon: (1) inherently or (2) as used. The first theory (inherently) is incorrect, but the second theory (as used) is correct"].)

*Aledamat* therefore does not apply here. Under the circumstances presented here, our Supreme Court and the United State Supreme Court direct us to decide whether it is reasonably probable that the jury misunderstood and misapplied the jury instructions such that the jury might have relied on an invalid theory of guilt. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 926 [same, citing *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72].) For the reasons outlined in our prior opinion and reiterated above, we conclude it is not reasonably probable. As a result, there was no instructional error. (*Ibid*.)

C. *Separate Sentences*

Defendants contend the trial court erroneously imposed separate sentences for their murder, torture, and child abuse convictions. We disagree.

At the time of their sentencing, section 654, subdivision (a) provided in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."[4]

The statute thus precluded "multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "'"'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may [not] be punished . . . for more than one.'"' [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

This means that "a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the

---

[4] Section 654 has since been amended to provide in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (Stats. 2021, ch. 441, § 1.)

offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.'" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717-718.)

We review a trial court's ruling on whether section 654 applies for substantial evidence. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, disapproved on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

Substantial evidence supports the trial court's finding that defendants' three convictions were sufficiently divisible and thus warranted separate sentences. Samiah died of dehydration, which occurred because defendants withheld water from her for two to three days before her death. Defendants' days-long withholding water from Samiah was thus temporally separated from the torture Stanch inflicted on Samiah in the hours before her death. The other acts of torture, including whipping and beating Samiah and pouring boiling water on her, were not life-threatening and thus formed a separate course of conduct from defendants' fatally withholding water from Samiah. Between beating Samiah and boiling the water to pour on her—two distinct, different actions--Stanch had plenty of time to reflect on her choices. The trial court thus properly found that section 654 did not apply to defendants' murder and torture convictions at the time of their sentencing.

The trial court also properly found (though impliedly) that the child abuse conviction was distinct enough from the murder and torture convictions and thus

26

warranted separate punishment. After whipping Samiah with a cord, Stanch boiled a pot of water to pour on Samiah's back. While the water was boiling, Stanch had sufficient time to reflect and reconsider her actions. She did not stop the abuse, but aggravated it by pouring the boiling water on Samiah's back, causing her new, severe injuries. The trial court thus could properly find that Stanch's whipping Samiah and pouring boiling water on Samiah's back were sufficiently separated in time such that separate punishment was warranted for the torture and child abuse convictions. (See *People v. Goode* (2015) 243 Cal.App.4th 484, 493.)

D. *Remand Under Amended Section 654*

Defendants argue we should remand the case so that the trial court can exercise its newly granted discretion under amended section 654. In particular, defendants argue remand is appropriate so the trial court can decide whether to stay the 25-years-to-life sentence on count 1 (murder) instead of staying the four-year enhancement for willful harm causing death (§ 12022.95) imposed on count 3 (child abuse) under section 654 as amended by Assembly Bill No. 518.

While this appeal was pending, the Legislature passed and the Governor signed Assembly Bill No. 518, which amended section 654. Section 654, subdivision (a) previously provided, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Assembly Bill No. 518 amended the statute to state,

27

"An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  (Stats. 2021, ch. 441, § 1.)

In other words, under the prior version of section 654, "the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term[s]," but amended "section 654 now provides the trial court with discretion to impose and execute the sentence of [any] term, which could result in the trial court imposing and executing [a] shorter sentence rather than the longe[st] sentence."  (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

In our prior opinion, we noted that the parties agree, as do we, that amended section 654 is an ameliorative statute that applies retroactively to defendant's non-final case.  (*People v. Jones* (2022) 79 Cal.App.5th 37, 45; *In re Estrada* (1965) 63 Cal.2d 740, 742.)  We conclude that, under these circumstances, we must remand for resentencing "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'"  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

*Salazar* confirms that this approach was correct.  There, our Supreme Court reaffirmed *Gutierrez*'s holding that when, as here, a new sentencing law applies retroactively and affects the sentencing court's discretion, reviewing courts must "'remand for resentencing unless the record "clearly indicate[s]" that the trial court would

28

have reached the same conclusion "even if it had been aware that it had such discretion.""" (*People v. Salazar*, *supra*, 15 Cal.5th at p. 424.)

We applied that standard in our prior opinion and reapply it here. The record clearly indicates the trial court would not have imposed the four-year enhancement on count 3 while staying the 25-years-to-life sentence for murder if it had the discretion to do so at the time. Right before imposing its sentence, the trial court explained that it had to consider the mitigating and aggravating sentences to decide the appropriate sentence. The court noted that there were some mitigating circumstances—both defendants were young, Stanch had no record, Greer had an "insignificant record," and Greer submitted a "number of letters of good character." But the court then stated, "there are some crimes that are so egregious and crimes where the aggravating factors *far outweigh* any mitigating factors, and I believe that's the kind of case we have here." The trial court then sentenced consecutive sentences—not concurrent sentences as defendants requested—on counts 1 and 2, and imposed an upper term (but concurrent) sentence on count 3 with a four-year consecutive term for the section 12022.95 enhancement (stayed under section 654).

In our view, the trial court's findings that defendants' offenses were "so egregious" and the aggravating circumstances "far outweighed" the mitigating circumstances, coupled with the court's lengthy sentence, clearly indicate that the court would not impose a four-year sentence on count 3, instead of a 25-years-to-life sentence

29

on count 1, under amended section 654.  We therefore decline to remand for resentencing.

## IV.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
                                                                          J.

We concur:


RAMIREZ
            P. J.


McKINSTER
            J.